UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 3:10-CR-87 JD |
| | ) | |
| ALEX KINER | ) | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is the Defendant Alex Kiner's motion to dismiss his indictment [DE 59]. Kiner filed his motion on November 22, 2011, and the government responded that same day [DE 63]. The motion seeks dismissal of the indictment based on the government's allegedly willful failure to inform Kiner of the existence of a key witness in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). On January 4, 2012, the Court held an evidentiary hearing to take the testimony of the witness at issue, as well as rebuttal evidence from the government [DE 66]. For the reasons enumerated, the Court finds that the government has not violated *Brady* or otherwise engaged in misconduct. Defendant's motion is therefore denied.

## I. BACKGROUND

**A.      Prior Proceedings**

Alex Kiner was indicted in July 2010 for possessing a firearm and ammunition as a convicted felon—the case has been substantially delayed, in great part due to the replacement of defendant's first counsel and several pre-trial motions filed by defendant. The prohibited items were discovered on February 16, 2010, at Kiner's residence at 624 Donnelly Street in Michigan City, Indiana, during the attempted execution of an arrest warrant for Kiner's nephew, Dejavone Woods. In December 2010, Kiner filed a motion to suppress the firearm and ammunition upon which his indictment is predicated. *See* DE 17. He argued that the evidence was discovered based on violations of his Fourth

Amendment rights: although the government did obtain a search warrant for its February 16 search of the residence, Kiner argued that the firearm and ammunition were not in plain view during the initial police sweep and thus that the search warrant was invalid.

The Court held an evidentiary hearing at which it took testimony from law enforcement agents involved in the search and Charles Day, a relative of Kiner. *See* DE 21, 34. Michigan City Police Detective Marty Corley and ATF Agent Kevin Whitaker testified that they came to the house to execute an arrest warrant for Dejavone Woods, who lived with Kiner at the time. When they arrived at the house at 8:00 a.m. on the morning of February 16, an individual named Johnnie Day answered the door, identified himself as a resident, and stated that he did not know whether Woods was home. The officers then entered and conducted a protective sweep of the home to see if Woods was present. During their sweep, the officers claimed to have seen a firearm and ammunition in plain view in one bedroom, which they were able to link to Kiner based on a diploma on the wall and other identification. Once they discovered that Kiner was a convicted felon, the police obtained a search warrant and seized the firearm, ammunition, and other items discovered in the home. While they waited for the search warrant, officers kept the home secure: they testified that while some family members came to the door that morning, no one but Johnnie Day and the police was allowed in the house. Charles Day, on the other hand, claimed that the firearm belonged to him and he had left it concealed in Kiner's bedroom the previous evening, not in plain view. The Court denied the motion to suppress, reasoning that even if Charles Day's testimony were true, it did not contradict the officers' testimony that the firearm was in plain view when they performed the protective sweep of the house. *See* DE 24.

Defense counsel eventually moved the Court to reconsider its denial of the motion, arguing that regardless of whether the firearm and ammunition were in plain view, police should not have been in Kiner's home at all that morning because they did not have reason to believe that the subject of their arrest warrant was actually present at the time they entered. *See* DE 45. The Court denied that motion as well, holding that the early morning hour, combined with Johnnie Day's confirmation that Woods lived there and his uncertainty whether Woods was present, gave the police sufficient reason to believe that Woods may have been in his own residence. *See* DE 51.

**B.     The Motion to Dismiss**

Defense counsel then discovered, apparently just days before the case was set to go to trial, that a neighbor, Blake Fleming, claimed to have been allowed into the house and questioned by the officers. Fleming was not mentioned in the first evidentiary hearing and the government did not otherwise make his existence known to Kiner. This prompted Kiner's motion to dismiss, and the Court set an evidentiary hearing in response to the motion. At that hearing, on January 4, 2012, Fleming—who has known Kiner and Woods since he was a child and has lived next door to Kiner on Donnelly Street for a decade—testified to his recollection of the events of the morning of February 16, 2010. According to Fleming, he returned home from an overnight work shift about 7:30 a.m. At around 8:30, Woods called Fleming and asked him to check the front door of 624 Donnelly, because a police detective had called him to let him know that the door had been left open. A short time later, still on the phone with Woods, Fleming went to the house. When he opened the screen door, he was confronted by three officers with rifles and Officer Corley (whom he recognized). Corley asked who he was and what he was doing there, Fleming explained that he was on the phone with Woods and offered to let Corley speak with him on the cell phone. Corley told Fleming to hang

3

up the phone and instructed him to sit at a table in the dining area, across from Johnnie Day. Fleming described the scene in some detail: the table had four chairs, and there was nothing on the table but some papers. While sitting at the table, Fleming heard drilling and saw two other officers enter the living room from the rear of the house. These officers, like the rest, were dressed in dark blue. After between 30 and 45 minutes, Fleming was permitted to leave, returned to his home, and went to sleep.[1]

The government called several officers as witnesses. First, Detective Corley testified that Fleming had, indeed, come to the door of 624 Donnelly. Although Corley could not recall the exact time of Fleming's arrival, he did know that it was after the protective sweep but before police obtained the search warrant. Again, the testimony suggests that the officers arrived at the house about 8 a.m. and that Fleming arrived approximately 8:45 a.m. Beyond that, Corley denied virtually all of Fleming's testimony: no detective, to his knowledge, had called Woods; none of the officers did any drilling, or even had drills, that morning; perhaps most significantly, Fleming had not been speaking on a cell phone when he came to the door and was not allowed into the residence. Second, Detective Mark Radiger testified that he was in the home the entire time and that the only non-police officer in the home was the man who answered the door (Johnnie Day). While several people had come to the door, they were not let in. He remembered Fleming coming to the door, and recalled that he was holding a cellphone. Radiger had no contact with Fleming and learned his name only from a later conversation with Corley. Third, the government called Mark Raymond, a patrolman with

---

[1]Kiner's sister, Ms. Katie Day Stone, also testified at the hearing. She explained that she, as well as other relatives, had gone to the house in the late morning after learning that the police had been seeking, and eventually arrested, Woods. She claims she was allowed into the house briefly, but was not allowed to walk-through until after the police had obtained and executed the search warrant. The Court does not find this testimony relevant to the matter before it, as it appears the protective sweep and subsequent search had been completed prior to her admission.

4

the Michigan City police department. Raymond was initially assigned to perimeter duty, but later entered the home. He testified that no one entered the residence the entire time he was there. He recalled a least one female coming to the door, but no male, and he did not know who Fleming was. Finally, ATF Agent Whitaker testified that he was present in the home the entire morning and that no one was brought into home. While he admitted that he did not have the table in view at all times, he stated that he would have noticed if someone else had been at the table for 30 to 45 minutes. Whitaker, like Corley, testified that no drilling had taken place at the residence.

In addition to the witnesses testimony, the government entered two photographs. The first was of the outside of the house. The second was of the dining area and taken before the search warrant was obtained; it showed that the table had two chairs and was covered by various items including ashtrays, a glass, and part of a chess set.

## II. ANALYSIS

As the foregoing account of the evidentiary hearing demonstrates, Fleming's story and that of the officers are irreconcilable. The only common ground between the testimonies is that Fleming came to the door of 624 Donnelly at some point on the morning of February 16, after the police had already entered and secured the premises.

To begin, the Court notes that even if it accepted Fleming's testimony over that of the officers, there would still be several hurdles to Kiner's motion to dismiss. First, while the dismissal of an indictment is in theory available to sanction outrageous government misconduct, to this Court's knowledge the Seventh Circuit has never seen a case that warrants such an extreme step. *See United States v. Childs*, 447 F.3d 541, 545 (7th Cir. 2006). It would certainly be unusual for a *Brady* violation, for which the remedy is generally a new trial and then only "if the suppression undermines

5

confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). Indeed, defense counsel points the Court to just one case dismissing a case for *Brady* violations, and that from a Florida district court and involving significantly more egregious misconduct than is alleged here. *See United States v. Lyons*, 352 F.Supp.2d 1231 (M.D.Fla. 2004). Second, Kiner would need to convince the Court that withholding evidence material to a motion to suppress even violates *Brady*: the Seventh Circuit has avoided deciding the issue, which has split the circuits. *See United States v. Stott*, 245 F.3d 890, 902 (7th Cir. 2001) (declining to reach the issue and noting a split between the Ninth and Fifth Circuits in favor and the D.C. Circuit against). Third, he would need to establish that Fleming's testimony would have been material to the issue of suppression to show a Due Process violation under *Brady*. *See United States v. Hartbarger*, 148 F.3d 777, 786 (7th Cir. 1998). But that is not the case: the only reasonable inference from the evidence is that Fleming arrived *after* the police had swept the home, discovered that Woods was not at home, and spotted the firearm and ammunition in plain view and the police already had all the information they needed to obtain a search warrant for the residence.[2] Finally, it is not clear that Kiner would be at all

---

[2]The Court acknowledges that were it to find Fleming credible, it would also have to question the credibility of all four officers who testified at the January 4 hearing. Such a finding could likewise call into question the credibility of testimony at the original suppression hearing, including the claim that the firearm and ammunition were in plain view, which formed the basis for the Court's original ruling on the motion to suppress. For that reason the Court proceeds to determine the credibility of the witnesses despite the apparent lack of materiality of Fleming's testimony.

6

prejudiced by the government's alleged misconduct. There has been no trial yet and the Court would be free at this point—if it believed Fleming's story—to reconsider the motion to suppress.[3]

But all of these concerns and obstacles are academic because the Court does not find that Fleming's testimony is credible. Instead, the Court credits the officers' testimony that Fleming never entered the house and never told Detective Corley that Woods was on the phone and not at home. The testimony of each of the four officers is, other than in a few details, consistent with the others and consistent with Corley's and Whitaker's testimony at the original suppression hearing. The events they describe—securing the premises and refusing entry until after the search warrant had been executed—are logical and consistent with standard procedure. Moreover, the government would have had no motivation to conceal Fleming from the defense at the first hearing because, as already noted, his testimony would not have undermined their case.

On the other hand, Fleming's testimony suffers from three significant concerns. First, he has known Kiner all his life and is close to Kiner's nephew, Dejavone Woods. He thus may have the motive to assist Kiner. Second, his story is implausible in certain respects: Why would Woods call a neighbor to close his door before trying to contact his cousin, Johnnie Day, who was still at the house? And why would Corley, contrary to protocol, allow a neighbor to enter a secured home while awaiting the search warrant? Finally, although Fleming claims to remember very specific details about the table at which he purportedly sat, which might otherwise bolster his credibility, this testimony is contradicted by the photograph of the dining area. Thus, the Court does not believe that

---

[3]No such reconsideration is warranted. As discussed below, the Court does *not* believe that Fleming informed the police that he was on the phone with Woods. Moreover, such a revelation, coming as it did *after* the sweep, could not have affected the officers' reasonable belief that Woods was home at the time they entered the residence. The instant ruling therefore has no impact on the Court's previous rulings on the motion to suppress.

7

Fleming entered the Donnelly street residence on the morning of February 16 or that he gave the police any information relevant to their search for Woods or their search of the residence.

### III. CONCLUSION

For these reasons, the Court finds that the government has not withheld material evidence from Kiner or otherwise engaged in misconduct. Defendant's motion to dismiss [DE 59] is **DENIED**.

SO ORDERED.

ENTERED:  January 20, 2012

                                              /s/ JON E. DEGUILIO
                                          Judge
                                          United States District Court